**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Lee D. HOLMES, Defendant–Appellant, Cross–Appellee.**

**Nos. 91–5365, 91–5443.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1992.

Decided Sept. 16, 1992.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Frederick A. Stine, V, Asst. U.S. Atty. (argued and briefed), Covington, Ky., for plaintiff-appellee, cross-appellant.

Larry Hicks (argued and briefed), Fort Mitchell, Ky., for defendant-appellant, cross-appellee.

Before: GUY, NORRIS and BATCHELDER, Circuit Judges.

ALAN E. NORRIS, Circuit Judge.

Defendant, Lee David Holmes, was charged with three counts of transporting a firearm in interstate commerce with intent to commit a felony, in violation of 18 U.S.C. § 924(b). At the conclusion of his trial, on January 24, 1990, the jury found him guilty on two of the counts and not guilty on the third count. Pursuant to a downward departure from the term calculated under the Sentencing Guidelines, he was sentenced to thirty-six months' imprisonment on each count, to run concurrently. On appeal, defendant contends that the district court misapplied the Sentencing Guidelines by using a guideline in effect at the time of sentencing rather than the one in effect at the time of the offense; that his inculpatory statements should not have been admitted at trial because they were improperly kept from the defense during discovery; and that the indictment should

have been dismissed for vagueness because it did not specify the felony he intended to commit. The government cross-appeals, contending that the district judge misapplied the Sentencing Guidelines by looking only to kidnapping and not murder as the crime defendant intended to commit, and that the district judge failed to provide an adequate basis for imposing the downward departure.

## I.

In April of 1989, defendant drove from his home in Georgia to Cincinnati, Ohio, and then to Lexington, Kentucky. After experiencing problems with his 1972 Ford Mustang, he rented a 1989 Mercury Grand Marquis from a Hertz Corporation facility in Lexington, and returned to Cincinnati. At 2:10 a.m. on April 18, a Mariemont, Ohio police officer came upon the Marquis, which was illegally parked at an intersection, and noticed that the license plate was altered with blue tape. The officer contacted Hertz, which towed the car to its Greater Cincinnati Airport facility in northern Kentucky at about 8:00 a.m. the same morning. Hertz personnel contacted the Cincinnati Airport and Mariemont Police after discovering a number of suspicious looking items in the car, including a trench coat with strips of duct tape on the inside and a stocking mask in the pocket, and pieces of rope with loops tied in them. Maps of Cincinnati and Lexington were also found in the car.

At 11:50 a.m. the same day, defendant reported to Hertz that the Marquis was stolen, and requested a replacement. He was told that he must first inform the Mariemont Police, which he did that afternoon. The police met defendant at the Mariemont Inn, informed him that Hertz had the car, and asked him to accompany them back to the police station, where they questioned him about the altered plates and the items found in the Marquis. Defendant denied altering the plates, but admitted ownership of all the items in the car except the stocking mask. He indicated that his personal car was at the airport in Lexington, and this information was passed to the Lexington Police. He subsequently obtained another car from Hertz's downtown Cincinnati location.

The next day, April 19, the manager of a Pizza Hut in Lexington found a briefcase in a dumpster behind his restaurant, and subsequently discovered that it contained .38 caliber bullets, a brochure from The Pastry Shop, a business card with defendant's name on it, newspaper clippings, a piece of paper from the Ramada Inn with the name Paul Diekmeyer on it, and extensive notes containing a detailed plan involving a kidnapping, robbery, and murder. These items were passed to police officers in Lexington, who obtained a search warrant for defendant's Mustang, parked at the Lexington Bluegrass Airport. In that car they discovered credit cards and hotel receipts, paperback books about homicide, a large knife, and clothing with an April 10 receipt from a K–Mart in Lexington. The receipt listed eighteen items, including panty hose, a screwdriver, duct tape, nylon rope, and a file.

On April 21, defendant called Hertz's Cincinnati Airport location to complain about a broken air conditioner in his second rental car, and was told to bring the car to the airport. Upon his arrival, he was met by Cincinnati Airport Police and accompanied them to the facility's police office for questioning by federal agents. Defendant initially denied having been in Cincinnati before, but, when confronted with Cincinnati hotel receipts, admitted that he had. He also admitted that most of the items found in the first rental car, the Marquis, were his, and he claimed that they were part of a sexual fantasy, or his fantasy about committing the perfect crime. He admitted that he had a gun in the second rental car, and a consensual search of that car revealed a .38 caliber revolver and speed loader, as well as pieces of nylon hosiery.

Defendant initially denied knowledge of the notes found in Lexington, but, after being asked for handwriting exemplars, he admitted that he had written them. He claimed that the two names on the notes, Paul Diekmeyer and Herb Krombholz,

were just names picked out of a Cincinnati phone book, and he denied having been to a jewelry store owned by either man. It was subsequently established, however, that the two men owned jewelry stores in the same area as The Pastry Shop, the brochure for which had been found in defendant's briefcase. The notes contained the correct address for Diekmeyer's jewelry store, and the correct addresses for Krombholz's store and his home. At trial, defendant testified that the plan in the notes was merely a story, and that he never intended to kidnap, rob, or murder anyone.

## II.

### A. Sentencing Guideline Calculations

Before imposing a downward departure, the district court found that the imprisonment range of 121 to 151 months, as determined in both the presentence report and the report of the magistrate who held a hearing on the issue, was properly calculated under the Sentencing Guidelines. Defendant contends that the district court violated the *ex post facto* clause of the Constitution because this range was calculated by applying the Sentencing Guidelines in effect at the time of sentencing rather than those in effect at the time of the offense. In its cross-appeal, the government argues that the calculation is erroneous because it is based on the determination that defendant intended to commit a kidnapping but fails to take into account his intent to commit murder.

### 1. Ex Post Facto Clause

■ Holmes asserts that the imprisonment range of 121 to 151 months was calculated pursuant to the Sentencing Guidelines in place following amendments that became effective on November 1, 1989, even though the activity for which he was convicted took place several months before that date. He argues that by applying the guidelines in effect at the time of the March 11, 1991 sentencing, as opposed to those in effect at the time of the offense,

April 1989, the court violated the *ex post facto* clause.[1]

The presentence report's recommendation of a 121–to–151 month sentence was based on its application of a pre-November 1989 guideline, that is, a guideline in effect at the time of the offense. The magistrate's report, issued following an April 26, 1990 hearing, recommended adoption of the presentence report's sentencing "calculations," finding the 121–to–151 month range appropriate, but did so on the basis of its application of a guidelines' provision that only became effective in November 1989. The judgment and sentencing order indicates that the district court adopted the factual findings and guidelines' application in the presentence report, but does not indicate whether the district judge considered the magistrate's assertion that defendant must be sentenced pursuant to the guidelines in effect at the time of sentencing rather than pursuant to the pre-November 1989 guidelines used in the presentence report.

In general, the sentencing court must use the guidelines in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4). However, "when the Guidelines in effect at the time of sentencing provide for a higher range than those in effect at the time the crime was committed, an *ex post facto* problem exists and the court must not impose a sentence in excess of that allowed by the older Guidelines." *United States v. Nagi,* 947 F.2d 211, 213 n. 1 (6th Cir.1991), *cert. denied,* ―― U.S. ――, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). Because of this *ex post facto* danger, we must determine what the sentence would be under the guidelines in effect at both times, to make sure that the guidelines in effect at the time of sentencing produce no harsher result than those in effect at the time of the offense.

Defendant was convicted of transporting a .38 caliber revolver in interstate commerce with the "intent to commit therewith" a felony, in violation of 18 U.S.C. § 924(b). At the time of the activities for which defendant was indicted, no guideline specifically addressed violations of section

1. "No Bill of Attainder of ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3.

924(b). The Sentencing Guidelines provide: "If the offense is a felony ... for which no guideline expressly has been promulgated, apply the most analogous offense guideline." U.S.S.G. § 2X5.1.

The presentence report deemed as most analogous the pre-November 1989 version of section 2K2.2, entitled "Receipt, Possession, or Transportation of Firearms and Other Weapons in Violation of National Firearms Act." That guideline applied to certain violations of 26 U.S.C. § 5861, which bans unlicensed manufacture and transport of specially regulated firearms, to wit, machine guns, sawed-off shotguns, and silencers. *See* 26 U.S.C. § 5845 (defining "firearms" as used in section 5861). Subsection 2K2.2(c)(1) provided: "If the defendant used the firearm in committing or attempting another offense, apply the guideline for such other offense or § 2X1.1 (Attempt or Conspiracy), if the resulting offense level is higher than that determined [in the other subsections of section 2K2.2, i.e., base level 12]." Pursuant to this cross-reference, the presentence report applied section 2X1.1, which dictates using the base offense level from the guideline for the object offense. The presentence report chose as the object offense kidnapping, which is covered in U.S.S.G. § 2A4.1 and has a base offense level of 24.

Defendant argues that the district court instead should have applied the pre-November 1989 section 2K2.3.[2] This provision was entitled "Prohibited Transactions in or Shipment of Firearms and Other Weapons." It applied to violations of 18 U.S.C. § 922, as well as certain provisions of 26 U.S.C. § 5861; it dictated a base offense level of only six for offenses other than violations of 26 U.S.C. § 5861, the statute addressing conduct involving machine guns, sawed-off shotguns, and silencers.

The pre-November 1989 section 2K2.3 only mandated a cross-reference to section 2X1.1, the attempts and conspiracy section, if "the defendant provided the firearm to another for the purpose of committing another offense, or knowing that he planned to use it in committing another offense." Defendant argues that because his offense did not involve providing a weapon "to another," it was inappropriate for the district judge to adopt a sentence based on the use of a cross-reference to section 2X1.1.

Defendant's argument is not well-taken. Although the violations addressed by the pre-November 1989 section 2K2.2 are not perfectly analogous to the section 924(b) violation at issue here, as defendant's crime did not involve a specially regulated weapon, that section is clearly more analogous than the pre-November 1989 section 2K2.3 advocated by defendant. The reason that the cross-reference provision in the pre-November 1989 section 2K2.3 refers to providing firearms "to another" is that, as indicated in its title, that guidelines' section dealt with firearm *trafficking* rather than firearm *use*. This is the same reason that it is not the most analogous section. The fact that defendant did not sell firearms "to another" only shows that this guideline did not apply to his crime; it does not show that his sentence should not have been determined pursuant to a cross-reference.

Therefore, the pre-November 1989 section 2K2.2 used in the presentence report was the most analogous and would have been the applicable guideline had sentencing taken place prior to the November 1, 1989 amendments.[3] As discussed above, application of this guideline results in a cross-reference to section 2X1.1, which in turn cross-references the section applicable

---

**2.** That provision is entirely different from the *post*-November 1989 section 2K2.3 used by the magistrate, as well as the pre-November 1989 section 2K2.2 used in the presentence report.

**3.** The government points out that the explanatory language accompanying the November 1989 amendments indicates that the new section 2K2.3, which by its terms applies to section 924(b) violations, was "formerly covered in a cross-reference." The government argues that

under *United States v. Sanchez,* 928 F.2d 1450 (6th Cir.1991), it is appropriate for a court to look to a more recent guideline or an updated version of a guideline for assistance in interpreting prior iterations. *Id.* at 1458–59. Because the analysis above demonstrates that a cross-reference was mandated under the pre-November 1989 guidelines, we need not address this argument.

to the crime at which defendant's plan was aimed.

In determining whether an *ex post facto* problem exists, we next look to see whether application of the Sentencing Guidelines in effect at the time of sentencing, the post-November 1989 guidelines, leads to a higher sentencing range than that which we just determined would result from the application of the pre-November 1989 version of section 2K2.2 of the guidelines in effect at the time of the offense. *See Nagi*, 947 F.2d at 213 n. 1. A new section 2K2.3, added in the November 1, 1989 amendments and entitled "Receiving, Transporting, Shipping or Transferring a Firearm or Ammunition With Intent to Commit Another Offense," specifically addresses section 924(b) violations.[4] This guidelines' section provides that the base offense level is to be determined by applying the greatest of three possibilities: (1) the offense level from section 2X1.1 (attempts, solicitations, and conspiracies) in respect to the offense the defendant intended to commit with the firearm; (2) the offense level from section 2K2.1 (unlawful receipt, possession, or transportation of firearms) or 2K2.2 (unlawful firearm trafficking); or (3) level 12. In this case, where the offense defendant intended to commit was kidnapping, robbery, or murder, the greatest of the three possibilities would be the first, that is, applying the offense level from section 2X1.1 in respect to one of those offenses.

Therefore, application of the guidelines in effect at the time of sentencing also results in a cross-reference to section 2X1.1, the provision for attempts and conspiracies, and an ultimate reference to the target crime of kidnapping, robbery, or murder. Because application of the guidelines in effect at the time of sentencing leads to no harsher a sentence than would result from the application of the guidelines existing at the time of offense, the magistrate's use of the post-November 1989 version of section 2K2.3 was appropriate and created no *ex post facto* problem.

*See Nagi*, 947 F.2d at 213 n. 1. If the district judge instead relied on the presentence report's application of the guidelines in effect at the time of the offense, which would ordinarily be an error, *see* 18 U.S.C. § 3553(a)(4), any such error is harmless because the same cross-reference to section 2X1.1 results from application of the guidelines in effect at either time.

### 2. Determination of Target Crime

The Sentencing Guidelines section entitled "Attempt, Solicitation, or Conspiracy," dictates the use of the "base offense level from the guideline for the object offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a). Upon being polled at the request of defense counsel, the jury members indicated that they found that defendant intended to commit kidnapping, robbery, and murder. In determining which object offense to look to, the guidelines' commentary states: "When offenses are closely interrelated, group them together for purposes of the multiple-count rules, and use only the offense level for the most serious offense...." U.S.S.G. Ch. 3, Pt. D, intro. comment. The presentence report's calculations which were adopted by the district court, compared kidnapping, robbery, and attempted murder, and concluded that the most serious offense of the three was kidnapping, with a base offense level of twenty-four. *See* U.S.S.G. § 2A4.1 ("Kidnapping, Abduction, Unlawful Restraint"). The government did not contest the inclusion in the comparison of attempted murder rather than murder, and the resulting reference to the guideline for kidnapping.

The Application Notes state that "[u]nder § 2X1.1(a) ... the only specific offense characteristics from the guideline for the object offense that apply are those that are determined to have been specifically intended or actually occurred. Speculative specific offense characteristics will not be applied." U.S.S.G. § 2X1.1, comment. (n. 2).

---

**4.** Under the November 1, 1989 amendments, three old guidelines—sections 2K2.1, 2K2.2, and 2K2.3—were consolidated into two guidelines, sections 2K2.1 and 2K2.2, and a new section 2K2.3 was added to cover certain violations of 18 U.S.C. § 924.

Based on the jury's finding and the evidence of the weapons, ropes, tape, and handwritten plans, the presentence report recommended increasing defendant's offense level by two pursuant to a provision in the guideline for kidnapping for use of a dangerous weapon, U.S.S.G. § 2A4.1(b)(3), and increasing it another four levels pursuant to the provision for restraint of a victim to facilitate the commission of another offense, U.S.S.G. § 2A4.1(b)(5). The report also recommended an increase for obstruction of justice because defendant lied to police during the investigation.

■ The government argues that the presentence report misapplied the specific offense characteristic set out in section 2A4.1(b)(5), which states:

> If the victim was kidnapped, abducted, or unlawfully restrained to facilitate the commission of another offense: (A) increase by 4 levels; or (B) if the result of applying this guideline is less than that resulting from application of the guideline for such other offense, apply the guideline for such other offense.

The presentence report called for a four-level increase pursuant to clause (A). The government argues that it should have called for the application of the guideline for first-degree murder, U.S.S.G. § 2A1.1,[5] pursuant to clause (B), because the jury specifically determined that defendant intended to commit murder. The government contends that this analysis was followed by the Fourth Circuit in *United States v. DePew*, 932 F.2d 324 (4th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991). That case involved an unconsummated conspiracy to kidnap a minor to make a "sex-snuff" movie in which the killing of the minor was to be captured on film. The sentencing court applied section 2X1.1, which addresses conspiracies not covered by a specific offense guideline, and determined that the object offense was kidnapping, as the defendant was indicted and convicted under 18 U.S.C. § 1201(c), the statute proscribing conspira-

cy to kidnap. In applying the guideline for that object offense, the court looked at section 2A4.1(b)(5) and determined that the planned kidnapping was intended to facilitate the commission of a murder. It held that because the base offense level for murder is forty-three, which is substantially higher than the base level of twenty-four for kidnapping, clause (B) of section 2A4.1(b)(5) dictated the application of the offense level for murder. The court of appeals held that the cross-reference to section 2A4.1, and the subsequent cross-reference to the guideline for murder pursuant to section 2A4.1(b)(5)(B), were proper.

However, unlike in *DePew*, it cannot be said that the plotted kidnapping in the instant case was meant "to facilitate the commission of" a murder. U.S.S.G. § 2A4.1(b)(5). Rather, defendant's notes indicate that his goal was to rob jewelry stores, and the kidnapping and murder outlined in his plans were meant to facilitate the commission of the robbery. *Cf. United States v. White*, 903 F.2d 457, 464 (7th Cir.1990) (kidnapping following an escape from prison held "to facilitate the commission of" the escape). Because applying the guideline for robbery would result in a lower offense level than the guideline for kidnapping, the district court properly applied clause (A) rather than clause (B).

■ The government argues that, alternatively, there should have been a four-level increase pursuant to the specific offense characteristic for "life-threatening bodily injury." U.S.S.G. § 2A4.1(b)(2). The presentence report did not apply or comment upon the provision in section 2A4.1(b)(2); the magistrate's report adopted by the district court concluded that the life-threatening bodily injury special offense characteristic was properly omitted because "[t]o make the further assumption of life-threatening bodily injury amounts to nothing more than speculative conduct."

The Application Notes to section 2X1.1 provides examples to illustrate the type of

---

**5.** U.S.S.G. § 2A1.1 addresses violations of 18 U.S.C. § 1111: murder with "malice aforethought" or "willful, deliberate, malicious and

premeditated killing." 18 U.S.C. § 1111 addresses conduct within "the special maritime and territorial jurisdiction of the United States."

conduct which is too speculative to apply for the unconsummated offenses to which the guideline applies:

> For example, if two defendants are arrested during the conspiratorial stage of planning an armed bank robbery, the offense level ordinarily would not include aggravating factors regarding possible injury to others, hostage taking, discharge of a weapon, or obtaining a large sum of money, because such factors would be speculative. The offense level would simply reflect the level applicable to robbery of a financial institution, with the enhancement for possession of · a weapon. *If it was established that the defendants actually intended to physically restrain the teller, the specific offense characteristic for physical restraint would be added.*

U.S.S.G. § 2X1.1, comment. (n. 2) (emphasis added).

In the instant case, the jury established that defendant intended to murder several people as part of his plan. Therefore, the determination that he intended to inflict life-threatening bodily injury is not "speculative" as the term is defined for the purpose of applying section 2X1.1(a). Accordingly, the district court should have imposed the four-level increase pursuant to section 2A4.1(b)(2) of the guideline for kidnapping. We therefore remand this cause and direct the district court to recalculate the Sentencing Guidelines' imprisonment range to take into account the presence of this specific offense characteristic.[6]

### B.  Downward Departure from Sentencing Guideline Range

■  At the sentencing hearing, the district judge found that adhering to the presentence report's calculated guidelines' range of 121–to–151 months' imprisonment would "work[ ] an injustice in this case," and therefore imposed a downward depar-

ture, sentencing defendant to only thirty-six months' imprisonment. As part of its cross-appeal, the government argues that both the imposition of and the extent of the downward departure were unjustified and inappropriate.

A sentencing court may depart from the sentences prescribed by the guidelines only where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). In determining whether a circumstance was adequately taken into consideration, a court may consider only "the sentencing guidelines, policy statements, and official comments" to the guidelines. *Id.* Furthermore, the court must state the "specific reason" for its departure in a short, clearly written statement or a reasoned statement from the bench. 18 U.S.C. § 3553(c)(2); *United States v. Todd,* 920 F.2d 399, 408–09 (6th Cir.1990).

A written statement attached to the judgment and order of the district court provides the following reasons for the downward departure:

> The statute of conviction in this case is almost exclusively used after a crime has been committed. In the instant offense, the crime was incomplete, and the Court notes that the alleged victims were never confronted or contacted in any manner by the defendant. The Court further finds that the guidelines are based on the underlying offense which in this instance was kidnapping. The offense behavior fell far short of what is normally considered a kidnapping offense. Consequently, the Court has some question as to whether or not the Sentencing Commission contemplated calculations based

---

6. It should be noted that the statutory maximum sentence for a violation of 18 U.S.C. § 924(b) is ten years' imprisonment; even under the presentence report's calculations, in which neither the guideline for first-degree murder nor the life-threatening bodily injury specific offense characteristic advocated by the gov-

ernment is applied, the sentence calculated is 121 to 151 months, exceeding the ten-year maximum. However, the proper application of the provision for a downward departure requires that the district judge first calculate the sentence properly pursuant to the provisions in the guidelines.

upon the offense behavior involved in this case.

The Court further finds that the psychological evaluation prepared in this case was insufficient in determining the defendant's intent as well as a prognosis for dangerous behavior in the future.

This circuit has adopted the three-pronged analysis set out in *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989), for reviewing downward as well as upward departures from the sentencing ranges called for by the guidelines. *United States v. Nelson*, 918 F.2d 1268, 1270 (6th Cir.1990). Under the first prong, "we assay the circumstances relied on by the district court in determining that the case is sufficiently 'unusual' to warrant departure"; this is a question of law, subject to *de novo* review. *Id.* (quoting *Diaz–Villafane*, 874 F.2d at 49). Under the second prong, "we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves fact finding and the trier's determinations may be set aside only for clear error." *Id.* Under the third prong, "the direction and degree of departure must, on appeal, be measured by a standard of reasonableness." *Id.*

### 1. Imposition of Downward Departure

The government argues that the fact that 18 U.S.C. § 924(b) is used "almost exclusively after a crime has been committed" and that victims were never confronted in this case does not justify a departure, because unconsummated offenses were clearly contemplated by the Sentencing Commission. Section 924(b) applies to anyone who carries a firearm in interstate commerce "with intent to commit" a felony, and the corresponding post-November 1989 guidelines section 2K2.3 states that the defendant is to be sentenced pursuant

to section 2X1.1 "in respect to the offense that the defendant intended ... to be committed with the firearm"; nothing in the wording of either indicates any requirement that an intended offense be consummated.[7] Furthermore, the government argues, section 2X1.1 of the Sentencing Guidelines provides for sentencing level decreases in most cases in which attempts, solicitations, and conspiracies are not consummated, *see* U.S.S.G. § 2X1.1(b), and thus the guidelines in general clearly contemplate offenses that are not consummated and never reach the point of endangering victims.

The government contends that the district court's other rationale for the departure, doubts concerning defendant's intent, is not valid because intent was an element of the government's case-in-chief and the jury clearly found that such intent existed.

The government's arguments are persuasive. According to section 2K2.3, the post–1989 section applicable to § 924(b) crimes, the base offense level is calculated by application of the offense level from § 2X1.1 with respect to the target crime. Section 2X1.1 then mandates a three-level decrease for attempts, conspiracies, and solicitations "unless the defendant completed all the acts the defendant believed necessary for successful completion of the offense or the circumstances demonstrate that the [defendant or conspirators were] about to complete all such acts but for apprehension or interruption by some similar event beyond defendant's control." U.S.S.G. § 2X1.1(b)(1). Since this downward adjustment for attempts, solicitations, and conspiracies is included in scheme for sentencing those convicted under 18 U.S.C. § 924(b), it cannot be said that the Commission failed to take into consideration situations where the target crime would not be consummated.

In other words, the argument goes, Congress knows how to require the actual subsequent commission of an illegal act, and therefore must have chosen not to do so when it enacted 18 U.S.C. § 924(b).

---

7. This argument is bolstered by comparing, for example, 18 U.S.C. § 1952, which states that it is illegal for anyone to engage in interstate travel with the intent to engage in specified unlawful activity if he "thereafter performs or attempts to perform any of the [unlawful] acts specified."

In this case, defendant was convicted of transporting a firearm in interstate commerce with the intent to commit an offense punishable by a prison term of more than one year, but he did not actually commit the target crime. Under the guidelines, failure to complete a target offense underlying a § 924(b) conviction is the equivalent of an attempt, and thus subject to the three-point reduction in the appropriate circumstances. Since the guidelines explicitly contemplate that those convicted under § 924(b) will receive a lesser penalty when the target crime was not completed, any further departure downward was unwarranted.

■ The court's second justification for departure, the insufficiency of the psychological evaluation regarding defendant's intent and prognosis for future behavior, is also misplaced. As the government noted, intent, as an element of the section 924(b) offense, was conclusively decided by the jury. Moreover, the guidelines expressly provide that a defendant's mental and emotional state is ordinarily irrelevant to departure. U.S.S.G. § 5H1.3.

Since the Sentencing Commission did contemplate the offense behavior involved in this case, the downward departure was not appropriate for the reasons articulated by the district court. We therefore remand for resentencing.

### C. Disclosure of Defendant's Statements to Government

■ Defendant next contends that his conviction must be overturned because it could not have been obtained absent the government's failure to provide the defense with statements to which it was entitled in discovery. Specifically, he contends that the government should have turned over, prior to trial, oral statements which, according to the trial testimony of a government agent, defendant made concerning his continuous possession of the .38 caliber firearm that formed the basis for his conviction under 18 U.S.C. § 924(b). Defendant argues that the fact that these statements were not included within the report

provided to him by the government raises the possibility that the government agent invented them to fill a gap in its case-in-chief.

Rule 16 of the Federal Rules of Criminal Procedure requires only that any written record of oral statements made by a defendant in response to interrogation and in the government's possession be turned over to a defendant who so requests. Fed. R.Crim.P. 16(a)(1)(A). As the government had no written record of the statements at issue, the government was under no duty to provide them to the defense.

### D. Sufficiency of the Indictment

■ Defendant's final contention is that the district court erred in denying his pretrial motion to dismiss the indictment, because the indictment failed to specify the felony he intended to commit. The statute under which defendant was convicted, 18 U.S.C. § 924(b), states, in pertinent part: "Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year ... ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be ... imprisoned not more than ten years...." Each of the three counts in the indictment specifies a different date in April on which interstate travel took place, and each specifies the states between which the firearm was transported on those dates. In all other respects the three counts are identical.[8] Count I states:

> On or about April 10, 1989 ... [defendant] with the intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, shipped or transported in interstate commerce a firearm, that is, a .38 caliber revolver, serial number 27153R, from Ohio to Kentucky; in violation of Title 18, United States Code, Section 924(b).

In *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), the Supreme Court set out the two criteria by which the sufficiency of an indictment is to be determined:

---

**8.** Defendant was convicted on two of the three    counts in the indictment.

[F]irst, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, secondly, "'in case any other proceedings are taken against him for a similar offence [sic], whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'"

*Id.* at 763–64, 82 S.Ct. at 1046–47 (citations omitted); *accord, United States v. Jones,* 647 F.2d 696, 699 (6th Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981). This court has held that, under *Russell,* "[a]n indictment is generally sufficient if it sets forth the words of the statute itself, as long as the statute itself adequately states all of the elements of the offense." *United States v. Paulino,* 935 F.2d 739, 750 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991) and 112 S.Ct. 883 (1992). However, the Court in *Russell* indicated that indictments are analyzed more carefully with respect to their descriptions of the acts comprising the "core of criminality": "Where guilt depends so crucially upon such a specific identification of fact … an indictment must do more than simply repeat the language of the criminal statute." *Russell,* 369 U.S. at 764, 82 S.Ct. at 1047.[9]

In this case, the "core of criminality" is the transportation of firearms over state lines, and both the firearm and the state lines were set out specifically in the indictment. The specification of the dates of travel, the description of the firearm, and the designation of the state lines crossed clearly put defendant on notice of the activity for which he was being charged, and adequately protect him against double jeopardy violations. *See Paulino,* 935 F.2d at 750 (the fact that an indictment "states the specific time frame in which the acts occurred … would satisfy any double jeopardy concerns.").

It is difficult to see how further specificity concerning the felonies he was charged with intending to commit would have helped his trial preparations, especially in light of the fact that his defense was not that he never drew up plans for a scheme involving kidnapping, robbery, and murder, but rather that he did not truly intend to carry out these "fantasy" plans. *Cf. Jones,* 647 F.2d at 699 (reversing a conviction for conspiracy to *possess* unregistered destructive devices where the indictment charged conspiracy to *construct* and *use* such devices, because the inaccurate description of the target crime created the danger that the defendant would be "misled while preparing his defense"). However, to the extent that specificity concerning the intended felonies would have been helpful to his defense, it was incumbent upon defendant to request a bill of particulars. *See Paulino,* 935 F.2d at 750.

Defendant cites *United States v. Trevino,* 720 F.2d 395 (5th Cir.1983) for the proposition that culpability under section 924(b) is "based on a defendant's intent rather than on the consummation of the underlying offense, [and therefore] it is … important that this intent be shown to focus on a *specific* underlying offense." *Id.* at 399 (comparing the requirements of section 924(b) to those for conspiracy convictions). However, the court in that case was ruling on the sufficiency of the evidence, not the sufficiency of the indictment, *see id.* at 399 n. 3, and merely held that "[w]hen the indictment charges the intent to violate a specifically designated statute, it follows logically that the defendant must be convicted only upon proof of the intent to violate each element of the underlying substantive offense." *Id.* at 400.

For these reasons, we hold that defendant's indictment was sufficiently specific, and therefore affirm the district court's order denying defendant's motion to dismiss the indictment.

9. "'[W]here the definition of an offense … "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species,—it must descend to particulars."'" *Russell,* 369 U.S. at 765, 82 S.Ct. at 1047 (citations omitted).

### III.

For the reasons stated above, we affirm the district court's judgment of conviction, but vacate the sentence and remand for further proceedings consistent with this opinion.